UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RAMIZ BILALIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20 CV 1845 RWS |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM AND ORDER

Plaintiff Ramiz Bilalic ("Bilalic") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Commissioner's ("Commissioner") decision to deny his application for disability insurance benefits and supplemental security income benefits. For the reasons explained below, I must affirm the decision.

## PROCEDURAL HISTORY

Bilalic filed a Title II application for disability insurance benefits on November 21, 2017 and a Title XVI application for supplemental security income

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

on December 27, 2017.  The claims were denied and Bilalic filed a timely request for a hearing.  The ALJ issued her decision on March 31, 2020, finding that Bilalic was not entitled to benefits.  He appealed and the Appeals Council denied his request for review.  Bilalic then filed this case seeking judicial review of the Commissioner's decision.  He argues that the ALJ did not properly evaluate the medical opinion evidence in the record and that the residual functional capacity ("RFC") she formulated was not supported by substantial evidence.

## LEGAL STANDARD

To be eligible for disability insurance benefits under the Social Security Act, a plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner conducts a five-step analysis. See 20 C.F.R. § 404.1520; Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If not, the disability analysis proceeds to the next step. At this step, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled and the analysis ends. If the claimant has a severe impairment, the Commissioner then determines whether the impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If the claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. If the impairment is not equivalent to a listed impairment, then the Commissioner proceeds to the fourth step to determine whether the claimant can perform his past relevant work. If so, the claimant is not disabled. If not, at the last step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the national economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

In reviewing the ALJ's denial of Social Security disability benefits, my role is limited to determining whether the Commissioner's findings comply with the

relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, I must consider evidence that both supports and detracts from the Commissioner's decision. Id. I must "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (internal citation omitted). I may not reverse a decision that is supported by substantial evidence in the record, even if substantial evidence in the record supports a contrary outcome, or if I would have decided the case differently in the first instance. Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011).

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See, e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering a claimant's subjective complaints, the ALJ is required to consider whether his complaints are consistent with the medical evidence. See Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (listing factors such as the claimant's daily activities, the duration, frequency, and

intensity of the pain, precipitating and aggravating factors, dosage, effectiveness and side effects of medication, and functional restrictions).[2]  When an ALJ gives good reasons for the findings, the court will usually defer to the ALJ's finding.  Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

## ADMINISTRATIVE RECORD

With respect to the medical records and other evidence of record, I adopt Bilalic's recitation of facts set forth in his Statement of Uncontroverted Material Facts, to the extent that they do not directly conflict with the Commissioner's Statement of Uncontroverted Material Facts and are supported by the record. Specific facts will be discussed as needed to address the parties' arguments.

---

[2] This was once referred to as a credibility determination, but the agency has now eliminated use of the term "credibility" to clarify that subjective symptom evaluation is not an examination of an individual's character.  However, the analysis remains largely the same, so the Court's use of the term credibility refers to the ALJ's evaluation of whether a claimant's "statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record."  See SSR 16-3p, 2017 WL 5180304, at *8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); Lawrence v. Saul, 970 F.3d 989, 995 n.6 (8th Cir. 2020) (noting that SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied" when evaluating a claimant's subjective complaints).

## HEARING BEFORE THE ALJ

Bilalic was 55 years old at his hearing on August 20, 2019.  He was represented by an attorney and testified with the assistance of a Bosnian interpreter. The ALJ and Bilalic's attorney briefly discussed Bilalic's back problems.[3]  (Tr. 72.) However, most of the hearing focused on his mental health.

Bilalic testified that he has lived in the United States for twenty years.  (Tr. 74.)  He lives with his girlfriend and their adult daughter; they do most of the household chores, including cooking, cleaning, and laundry, although Bilalic accompanies them on trips to the grocery store. (Tr. 76-77.)  He "sometimes" tries to help with chores.  (Tr. 78.)  He also "sometimes" visits friends and his sister and goes to the park with his girlfriend.  (Tr. 78.)  He sees a counselor, who comes to his apartment for their appointments.  (Tr. 79.)  He has trouble sleeping because of nightmares and feels that he is "always in [the] past, in what happened in the war."[4] (Tr. 80.)  He was prescribed sleeping medication which "helps," but only for a few hours at a time.  (Tr. 80.)  He has problems focusing and remembering, which affected his ability to perform tasks at his past jobs; he explained that once, a supervisor yelled at him for not cleaning a space that he thought he had already

---

[3] The ALJ's decision discussed evidence in the record relating to Bilalic's back problems.  Bilalic did not object to any of those findings in this appeal.

[4] Bilalic served in the Bosnian military.  (Tr. 402.)

cleaned.  (Tr. 81.)  He lost his job as a school janitor after informing a supervisor about his mental health issues.[5]  (Tr. 82.)  He cannot drive because he "see[s] shadows coming to [him]" and has difficulty "remembering streets."  (Tr. 81.)  He has twice attempted suicide.  (Tr. 83.)

## ALJ DECISION

The ALJ found that Bilalic met the insured status requirements of the Social Security Act through December 31, 2022 and had not engaged in substantial gainful activity since May 15, 2017, his amended alleged onset date of disability.  (Tr. 17.) The ALJ then determined that while Bilalic suffers from affective disorder, post-traumatic stress disorder (PTSD), and a psychotic disorder, these impairments do not meet or medically equal the severity of one of or a combination of the listed impairments in 20 C.F.R. § 404.[6]  (Tr. 17-18.)

---

[5] Bilalic testified that the supervisor told him to see a doctor.  The hearing testimony is unclear as to whether the doctor or the supervisor told Bilalic to stop working at the school.  (Tr. 82-83.)  A letter from Bilalic's attorney informs that he "was let go" from the job "due to the fear of the employer that he could harm someone."  (Tr. 274.)  However, records from several different appointments indicate Bilalic quit the job.  (Tr. 500, 617.)

[6] The ALJ considered whether Bilalic's mental impairments satisfy either the "paragraph B" or the "paragraph C" criteria.  To satisfy the "paragraph B" criteria, a claimant's mental impairments must cause at least two "marked" limitations or one "extreme" limitation in a broad area of functioning.  The ALJ found that Bilalic had only one "marked" limitation: interacting with others. She also found that he did not satisfy the "paragraph C" criteria because "the record does not establish a medically documented history of a disorder over a period of at least two years, with evidence of both (1) medical treatment, psychosocial support(s) or a highly structured setting(s) that is ongoing and diminishes the signs and symptoms of the mental disorder, and (2) marginal adjustment (i.e., minimal capacity to adapt to changes in demands not already a part of daily life)." (Tr. 18.)

Based on her consideration of the record, the ALJ found that Bilalic had an RFC to perform a full range of work at all exertional levels but with certain limitations.  He is limited to routine, repetitive tasks consistent with a special vocational preparation ("SVP") rating of 1 or 2 and should work in an environment requiring occasional decision-making and occasional changes in the work setting. His job should not require communication with others in the English language.  He should be able to learn the job by demonstration and should not be required to communicate with coworkers or the public; he should work with objects rather than people; he should never be required to interact directly with the public, although the public may be present in his working environment; he can casually and infrequently interact with coworkers, with no tandem tasks required; and he should have only occasional interaction with supervisors.  (Tr. 18-19.)  Based on Bilalic's RFC, the ALJ found that he could perform his past relevant work as a packager.  (Tr. 26.) Additionally, she found, based on the hypotheticals she posed to the vocational expert during the hearing, that Bilalic could work as a landscape laborer and bottling line attendant.  (Tr. 27.)  Accordingly, the ALJ denied Bilalic's applications.

## ANALYSIS

I.    <u>The ALJ did not err in evaluating the medical opinion evidence in the record.</u>

The record contains four medical opinions that discuss Bilalic's mental health. Under the new regulations for evaluation of medical evidence, which apply to

applications filed after March 27, 2017, ALJs are no longer required to "give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. § 404.1520c(a), 416.920c(a). Instead, ALJs are to consider all medical opinions equally and evaluate their persuasiveness according to several specific factors, the most important of which are supportability and consistency.    20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  "Supportability" is determined by whether an opinion is supported by relevant objective medical evidence, and the source's explanation for the opinion, while "consistency" is measured by how consistent the opinion is with other medical opinions and prior administrative findings.  20 C.F.R. §§ 404.1520c(c)(1)-(2).  An ALJ need only discuss other factors if "two or more medical opinions…about the same issue are both equally well-supported and consistent with the record but are not exactly the same."  20 C.F.R. §§ 404.1520c(b)(3); 416.920c(b)(3).

### 1. Dr. Kraushaar

Dr. Stone Kraushaar performed a consultative exam on March 22, 2018.  He found that Bilalic was markedly limited in one functional area: his ability to interact with others.  (Tr. 403.)  The ALJ found this opinion persuasive because it was consistent with the medical evidence in the record and Bilalic's self-reported level of function, and because Dr. Kraushaar personally examined Bilalic.  (Tr. 23-24.)

Bilalic argues that the ALJ did not adequately explain how Dr. Kraushaar's opinion was supported by or consistent with evidence in the record, aside from his April 2015 hospitalization and his own reports of ability.

Before Dr. Kraushaar's examination and subsequent report, Bilalic had been hospitalized twice for mental health problems.  He was first hospitalized in April 2015.  He presented to the emergency room at St. Anthony's Medical Center with hallucinations of bodily sensation, including feelings of electricity and bugs crawling underneath his skin.  (Tr. 307.)  He reported feeling "as if cameras are following him and various people are trying to hurt him" for the previous five months. (Tr. 312.)  He also reported turning off electronics and covering them with foil, and his family informed that he had been covering windows and mirrors with blankets.  (Tr. 313.)  He denied suicidal ideations throughout his several-day stay. (Tr. 311, 313, 316, 318.)  When he was discharged on April 17, Dr. Rashid Zia opined that he was "not a threat to himself or anybody else" and was "fully capable of working."  (Tr. 311.)

Bilalic was hospitalized again on May 8, 2017, this time for suicidal ideations. (Tr. 391-93.)  He reported that his antidepressants had stopped working.  (Tr. 391.) After this hospitalization, he began seeing psychiatrist Dr. Shazia Malik to treat his depression and PTSD.  (Tr. 387.)  In January 2018, Dr. Malik opined that "he is not as anxious" and that his "PTSD is somewhat better," but he still had symptoms that

"precludes [sic] him from having present need to maintain gainful employment."
(Tr. 540.)  In that same month, Bilalic completed a Function Report.  The answers
he gave about his ability to perform daily activities were consistent with his later
hearing testimony; he reported that he cannot do any household chores, does not
prepare his own meals, and is unable to drive because his medication makes him
drowsy.  (Tr. 237-38.)  He also reported that he can shop for three hours at a time;
manage money; and engage in leisure activities like listening to music and watching
TV.  (Tr. 237-40.)  Additionally, he represented that he could follow spoken and
written instructions and get along with authority figures "very well," and that he had
never been fired or laid off from a job because of problems getting along with other
people, although he indicated that he had trouble socializing and getting along with
others elsewhere on the form.  (Tr. 240.)

I find that it was appropriate for the ALJ to reference the above-detailed
evidence in her analysis of the persuasiveness of Dr. Kraushaar's opinion.  It was
not error to find his conclusions consistent with and supported by Bilalic's self-
reported level of function and Dr. Zia's statement that he was "fully capable of
working" after his April 2015 hospitalization, which, as the ALJ emphasized, was
when his "symptoms were less stable…than they were reported in the most recent
treatment notes."  (Tr. 23.)  Furthermore, her broader conclusion that Bilalic
"consistently reported improvement in his symptoms as his medications were

adjusted" after Dr. Kraushaar's opinion was rendered demonstrates that she found the opinion consistent with and supported by other evidence.  This finding is supported by the record as a whole.  (Tr. 23.)

Bilalic certainly still had problems with his mental health after March 2018. He continued to report depression, anxiety, trouble sleeping, nightmares, and paranoia.  However, he also consistently denied suicidal ideations, delusions, and hallucinations.  (Tr. 501, 521, 617, 620.)  He was not hospitalized again.  In August 2017, Dr. Emir Keric noted that his psychiatric issues were "pretty much stable." (Tr. 371.)  At a May 2018 appointment with Katrina Zlataric, APRN, he described his mood as "good" and reported that the medicine he had been prescribed helped his anxiety.  (Tr. 617.)  He expressed similar sentiments at a follow-up appointment in July 2018, during which he also demonstrated an appropriate affect; normal reasoning; logical and goal-directed thought process; and intact judgment, insight, language, attention/concentration, and executive functioning.  (Tr. 621.)  In October 2018, he told Dr. Nathalie Boulos that his episodes of hypervigilance were "better" with Xanax and when he isolated himself.  (Tr. 501.)  During another visit with Dr. Boulos in January 2019, he reported "feeling better than he used to" and was experiencing "generally restful sleep," decreased paranoia, and fewer anger outbursts.  (Tr. 510-11.)  In March 2019, he reiterated that his sleep was "generally restful" and that his depression "has much improved," though he still had thoughts

about being followed.  (Tr. 521.)  He also described some anxiety, which he attributed to his financial situation and the stress associated with being out of work. (Tr. 521.)  Finally, at a June 2019 appointment with Dr. Tulika Katyal, he indicated that his "depression symptoms [were] ok," although he still had anxiety and some sleep disturbance.  (Tr. 460-61.)

For the foregoing reasons, I find that the ALJ did not err in her evaluation of Dr. Kraushaar's opinion.

### 2.  *Dr. Markaway*

Dr. Barbara Markaway, a state agency consultant, reviewed Bilalic's records and provided an opinion on March 27, 2018.  She concluded that Bilalic was not markedly limited in any functional areas.  (Tr. 94-95.)  She also opined that Bilalic's "ability to be around people appears to be greater than he reports," and that Dr. Kraushaar "overestimate[d]…the severity of [Bilalic's] restrictions/limitations." (Tr. 93, 96.)  The ALJ found Dr. Markaway's opinion persuasive because it demonstrated a "thorough review of the medical evidence" and was consistent with Dr. Kraushaar's report.  (Tr. 24.)

Bilalic does not specifically explain how he believes that the ALJ erred in analyzing this opinion.  In his brief, he simply contends that Dr. Markaway "recited the evidence and formulated her conclusion without any explanation for how the evidence supports the findings."  However, I find that Dr. Markaway's opinion

demonstrates adequate consideration of the evidence in the record when formulating her RFC conclusions.  Moreover, the ALJ did not adopt all of Dr. Markaway's conclusions; rather, while she found the opinion "generally consistent with the record," she specifically noted that she "afforded [Bilalic] the benefit of the doubt with regard to assigning marked limitations to his social functioning." (Tr. 23.)  As a result, I find that she did not err in her analysis of this opinion.

### 3. Dr. Nair

Dr. Ajay Nair provided a source statement in August 2019.  He found that Bilalic is markedly limited in virtually all areas of work-related mental production and that his overall pace of production would be 31% or more below average.  (Tr. 625.)  He also found that Bilalic would need to be late to work or need to leave work early three or more times per month and would need to miss work entirely three or more times per month.  (Tr. 627.)  The ALJ found that "no convincing support exists in the record for [these limitations]." (Tr. 24.)  She concluded that the opinion was inconsistent with Dr. Kraushaar's.  She also found it internally inconsistent, as Dr. Nair's finding of "marked limitations in virtually all areas of work-related mental function" contradicted his other findings that Bilalic could "perform in a task-oriented setting where contact with coworkers is only casual and infrequent…where supervisors provide simple instructions for non-detailed tasks with no more than 4

14

supervisor contacts per day…[and where] contact with the general public is only casual and infrequent."[7]  (Tr. 24.)

Bilalic argues that the ALJ erred in concluding that Dr. Nair did not provide evidence to support his findings about why Bilalic would need to arrive late, leave early, or be absent from work.  As apparent explanation for these restrictions, Dr. Nair wrote that Bilalic experiences "severe depression leading to suicidal thoughts" and "paranoid delusions."  (Tr. 627.)  However, it is unclear how these diagnoses actually affect his ability to function in the workplace and are related to the specific restrictions that Dr. Nair noted.  Furthermore, it appears that Bilalic last experienced suicidal thoughts in May 2017.  (Tr. 391-93.)  After that time, he consistently denied suicidal ideations.[8]  (Tr. 501, 521, 617, 620.)  Dr. Nair also listed "many behaviors that indicate that he is suspicious and paranoid, including: boarding up windows in the home, unplugging electronic devices…stating that people following him want to kill him, and staying up at night to monitor the house."  (Tr. 628.)  While Bilalic clearly experiences paranoia and hypervigilance, some evidence in the record indicates that medication helps manage its severity.  (Tr. 501, 510.)  He has

---

[7] The ALJ also noted that "it is unclear whether [Dr. Nair] ever treated [Bilalic] on an ongoing basis, as there are no corresponding treatment notes to support these findings." (Tr. 24.)  In his brief, Bilalic explains that Dr. Nair supervised Dr. Nathalie Boulos, a resident who saw Bilalic for multiple appointments at SLU Care, and is therefore properly characterized as a treating physician.

[8] At an appointment with Dr. Boulos on October 11, 2018, Bilalic mentioned that he had occasional thoughts of death but that he would never commit suicide because of his family.  Dr. Boulos concluded that he denied suicidal ideation, thought or intent.  (Tr. 501.)

seemingly not experienced the other specific behaviors that Dr. Nair cited for several years; the last reference to these behaviors dates back to April 2015, well before Bilalic's amended alleged onset date of May 15, 2017.  (Tr. 312-16.)  Dr. Nair's opinion does not acknowledge the fact that these particular symptoms seem to have abated and does not discuss the overall improvement that the record reflects.  For these reasons, I find that the ALJ did not err in deeming his opinion unpersuasive.

### 4.  Dr. Kahn

Finally, Dr. Sharon Kahn provided an opinion in October 2019 after the ALJ forwarded medical interrogatories to her.  Dr. Kahn found Bilalic to be markedly limited in two functional areas: (1) his ability to interact with others, and (2) his ability to adapt and manage himself.  (Tr. 647.)  The ALJ found the second conclusion inconsistent with Dr. Kraushaar's findings and explained that she found his assessment more persuasive because he personally examined Bilalic.  (Tr. 24.)  She also found Dr. Kahn's findings inconsistent with Dr. Markaway's report and explained that the latter was more persuasive because it was "more detailed" and more consistent with the record.  (Tr. 25.)  As a result, she deemed Dr. Kahn's opinion unpersuasive.

Bilalic argues that the ALJ did not discuss the supportability of Dr. Kahn's opinion and merely compared it to Dr. Kraushaar's and Dr. Markaway's opinions without acknowledging that "the difference in opinion has to do with the fact that

Dr. Kahn was able to review the…entire file, while Dr. Kraushaar and Dr Markaway were only able to review a very small portion of records." As discussed previously, Bilalic's mental health symptoms appeared to be at their worst between April 2015 and May 2017 (although notes from a March 14, 2017 appointment indicate that he was still working full-time at that point). (Tr. 615.) Dr. Kraushaar and Dr. Markaway reviewed records from this period. The additional records that Dr. Kahn reviewed demonstrate that Bilalic's overall condition was improving, rather than declining, after May 2017. It is therefore unclear why Bilalic places such emphasis on the fact that Dr. Kahn "was able to review the…entire file."

Furthermore, there is no evidence in the record from after March 2018 that would support a finding of marked limitations in Bilalic's ability to adapt or manage himself. In apparent support of this finding, Dr. Kahn cited notes from the April 2015 hospitalization and the October 2018 appointment with Dr. Boulos during which Bilalic reported paranoia. (Tr. 307, 312, 501.) Dr. Kahn also listed Bilalic's "delusions, tactile hallucinations, flashbacks, nightmares, cognitive distortion, hypervigilance, and illusions" as diagnoses that would affect his ability to adapt or manage himself. (Tr. 643.) As discussed previously, Bilalic consistently denied hallucinations, delusions, and illusions, including during the same October 2018 appointment that Dr. Kahn cited. Moreover, Dr. Kahn did not provide any explanation of how these diagnoses would actually impact Bilalic's ability to adapt

17

or manage himself to such a degree that he would have a marked limitation in this functional area.

Finally, the ALJ specifically noted that Dr. Markaway's findings were "more consistent [than Dr. Kahn's] with the treatment notes showing essentially normal mental status examinations throughout the record." (Tr. 25.) This reference demonstrates her consideration of Dr. Kahn's findings in comparison with the evidence in the record. Additionally, she acknowledged that while Bilalic "may be somewhat dependent on his girlfriend for support, nothing convincing exists in the record to suggest that he would be unable to function in a working environment not involving close interaction with others." (Tr. 25.) The record as a whole supports this conclusion. As a result, I find that the ALJ did not err in her evaluation of this opinion.

II.   The RFC is supported by some medical evidence.

Bilalic also argues that the ALJ erred in basing her RFC determination upon the opinion of a consultative examiner (Dr. Kraushaar) and a state agency consultant (Dr. Markaway). He further contends that reliance on these opinions was especially inappropriate because they were rendered 17 months before the hearing, citing Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995) for the proposition that an ALJ "cannot rely on a non-examining physician's RFC when the agency RFC

assessments, completed almost a year prior to the hearing, were not based upon the full record."

The Social Security regulations expressly state that the ALJ is "responsible for assessing residual functional capacity."  20 C.F.R. § 404.1546(c), 416.946(c).  See also Winn v. Comm'r, Soc. Sec. Admin., 894 F.3d 982, 987 (8th Cir. 2018).  In making this determination, the ALJ must consider "all the relevant evidence in [the claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  While the ALJ has a duty to fully and fairly develop the record, she is not required to obtain additional medical evidence if the evidence of record provides a sufficient basis for her decision.  Martise v. Astrue, 641 F.3d 909, 926-27 (8th Cir. 2011).

The ALJ's written decision demonstrates that she carefully considered all of the evidence in the record and did not base her RFC determination solely on Dr. Kraushaar and Dr. Markaway's opinions.  Furthermore, as discussed previously, Bilalic's mental health appeared to be improving, rather than declining, after these two opinions were rendered.  This fact distinguishes his case from Frankl.  See, e.g., Beamer v. Saul, 2020 WL 1511350, at *8-9 (E.D. Mo. Mar. 30, 2020) (distinguishing Frankl and finding that it was appropriate for the ALJ to rely on an older medical opinion because "there is no evidence that Plaintiff's mental health deteriorated from the time of the state agency review to the time of the hearing"); Fritzke v. Colvin, 2015 WL 12781200, at *15 (D. Minn. Mar. 2, 2015) (same,

19

because the record demonstrated that the plaintiff's condition improved in the years after the old opinion was rendered).

The ALJ discussed evidence of Bilalic's improvement in her decision.  She accounted for Bilalic's difficulties with social functioning by imposing restrictions limiting his interactions with coworkers, supervisors, and the public and finding that he should work with objects instead of people.  (Tr. 18-19.)  These limitations on Bilalic's abilities are consistent with the evidence submitted about his mental health. The record demonstrates that Bilalic appeared to experience improvement in his symptoms after taking prescription medication; that he was able to perform many activities of daily living without trouble; and that various medical providers consistently noted normal mental examinations.  (Tr. 238-40, 402, 403, 460, 501, 511, 521, 617, 620-21.)  It is ultimately the claimant's burden to establish his RFC, and Bilalic failed to carry this burden by producing any evidence that his RFC should be more limited.  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).

Although Bilalic believes that the ALJ should have assessed the medical evidence differently to support greater limitations, it is not my role to reweigh the evidence considered by the ALJ in her determination of a claimant's RFC.  Id. at 934. Here, the ALJ did not substantially err when she concluded, based on the evidence in the record, that Bilalic had the RFC to perform a full range of work at all exertional levels with certain limitations.

The written decision demonstrates that the ALJ evaluated all of the medical evidence of record and adequately explained her reasons for the weight given this evidence in a manner consistent with the regulations. Substantial evidence in the record as a whole supports the ALJ's RFC determination, so I must affirm the decision of the Commissioner as within a "reasonable zone of choice." Fentress v. Berryhill, 854 F.3d 1016, 1021 (8th Cir. 2017) (citing Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008)).

Accordingly,

**IT IS HEREBY ORDERED that** the decision of the Commissioner is affirmed, and Ramiz Bilalic's complaint is dismissed with prejudice.

A separate Judgment is entered herewith.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 9th day of May, 2022.